

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7987 | **DATE** | 1/20/2004 |
| **CASE TITLE** | PPM Finance vs. Norandal | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and order. Judgment is entered in favor of Jackson in the amount of the sum total of the fifteen payments at issue, plus prejudgment interest at the statutory rate of five (5) percent per annum, running from the date that Norandal received each payment.

*Amy J St. E*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | number of notices | |
| | No notices required. | | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| TH ✓ | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

PPM FINANCE, INC., in its capacity as agent for )
JACKSON NATIONAL LIFE INSURANCE )
COMPANY, )
)
        Plaintiff, )
)
           v. )
)
NORANDAL USA, INC., )
)
        Defendant. )
_____ )
)
NORANDAL USA, INC., )
)
        Counter-Plaintiff, )
)
           v. )
)
PPM FINANCE, INC., in its capacity as agent for )
JACKSON NATIONAL LIFE INSURANCE )
COMPANY, PPM AMERICA SPECIAL )
INVESTMENTS CBO II, L.P. AND PPM )
SPECIAL INVESTMENTS FUND, L.P., )
)
        Counter-Defendants. )

No. 02 C 7987

DOCKETED
JAN 3 1 2004

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge:

      Plaintiff PPM Finance, Inc., in its capacity as agent for Jackson Mutual Life Insurance

Company ("Jackson"), filed a two count complaint against Defendant Norandal USA, Inc.

("Norandal") alleging breach of contract and breach of fiduciary duty. (R. 36-1, Am. Compl.)

Specifically, Jackson alleged that Norandal failed to remit to Jackson certain payments that their

common debtor, Scottsboro Aluminum, L.L.C. and Scottsboro Properties, L.L.C. (collectively,

"Scottsboro"), paid to Norandal in violation of a Subordination Agreement between Norandal and Jackson.

Norandal filed a three count counterclaim against PPM America Special Investment Fund, L.P. ("PPM Fund"), PPM America Special Investment CBO II, L.P. ("PPM CBO II") (collectively, the "PPM Entities"), and PPM Finance in its capacity as agent for Jackson.[1] (R. 35-1, Norandal's First Am. Countercl.) In Count I, Norandal seeks a declaratory judgment that Jackson and the PPM Entities have no right to recover the payments at issue. In the alternative, in Count II, Norandal alleges that Jackson and the PPM Entities are equitably estopped from recovering the payments. In Count III, Norandal alleges that its right of recoupment defeats Jackson's and the PPM Entities' claims to an affirmative recovery.

Jackson moved for summary judgment in its favor on its amended complaint and against Norandal on Norandal's amended counterclaims. Norandal moved for summary judgment in its favor on its amended counterclaims. For the reasons stated herein, Jackson's motions for summary judgment on its amended complaint and Norandal's amended counterclaims are granted, and Norandal's motion for summary judgment on its amended counterclaims is denied.

## LEGAL STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence

---

[1] Norandal also asserted twelve affirmative defenses. (R. 37-1, Norandal's Answer and Affirmative Defenses to the First Am. Compl. of PPM Finance.)

is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). A party will successfully oppose summary judgment only if it presents "definite, competent evidence to rebut the motion." *Equal Employment Opportunity Comm'n v. Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). The Court "considers the evidentiary record in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.*, 282 F .3d 467, 471 (7th Cir. 2002).

## BACKGROUND

### I. The Credit Agreement

On February 26, 1999, Norandal agreed to sell its Alabama aluminum processing plant and related assets (the "Plant") to Scottsboro for a total purchase price of approximately $92 million (the "Scottsboro Acquisition"). (R. 49-2, Jackson's Local Rule 56.1(a) Statement of Undisputed Facts Submitted in Supp. of Jackson's Mot. for Summ. J. on its Am. Compl. and Norandal's Affirmative Defenses and Jackson and the PPM Funds' Mot. for Summ. J. on Norandal's Am. Countercl. ("Jackson's Rule 56.1(a)(3) Statement") ¶¶ 7, 13; R. 62-1, Def.'s Resp. to Pl. and Counterdefs.' Local Rule 56.1 Statement of Uncontested Facts and Statement of Genuine Issues and Statement of Add'l Facts That Require Denial of Pl. and Counterdefs.' Mots. for Summ. J. ("Norandal's Rule 56.1(b)(3)(A) Response") and ("Norandal's Rule 56.1(b)(3)(B) Statement of Additional Facts") ¶¶ 7, 13.) Scottsboro entered into a Credit Agreement with

Jackson and its agent PPM Finance to obtain funds to purchase the Plant. (*Id.* ¶¶ 7, 11.) Under the Credit Agreement, Jackson agreed to make certain loans and other extensions of credit to Scottsboro of up to $125 million. (*Id.* ¶ 8.) Jackson loaned Scottsboro approximately $69 million and PPM Fund loaned Scottsboro $7.5 million. (*Id.* ¶ 14.)

Jackson, a lender under the Credit Agreement, is a life insurance company organized under the laws of, and with its principal place of business in, Michigan. (*Id.* ¶ 1.) Norandal, the seller of the Plant, is a Delaware corporation with its principal place of business in Tennessee. (*Id.* ¶ 4.) It operates aluminum rolling mills in Tennessee, North Carolina, and Alabama. (*Id.*) Counter-defendants PPM Fund and PPM CBO II are both Delaware limited partnerships with their principal places of business in Illinois. (*Id.* ¶¶ 2-3.)

## II. The Subordinated Note

For the remainder of the purchase price, Scottsboro executed a promissory note in Norandal's favor (the "Subordinated Note") for approximately $7.8 million. (*Id.* ¶ 23.) The seller, Norandal, thereby became a second creditor of the buyer, Scottsboro. (*Id.*) Under the Subordinated Note, Scottsboro agreed to pay Norandal equal, consecutive monthly installments of $215,925.64 on the principal amount (plus accrued unpaid interest) beginning on March 31, 1999 and continuing through February 28, 2002. (*Id.* ¶ 64.) Between November 1, 1999 and January 18, 2001, Norandal received fifteen scheduled monthly payments from Scottsboro under the Subordinated Note, totaling over $3.7 million. (*Id.* ¶ 65.) The Subordinated Note is explicitly subject to the Subordination Agreement. (*Id.* ¶ 24.)

Through the Credit Agreement and the Subordinated Note, Norandal received a total of $84,277,195.00 as a result of the funding and closing of the Scottsboro Acquisition. (*Id.* ¶ 12.)

## III.    The Subordination Agreement

On February 26, 1999, the same day the parties executed the Credit Agreement, Scottsboro, the PPM Entities, and PPM Finance in its capacity as agent for Jackson executed a Subordination Agreement. (*Id.* ¶ 29.) Jackson and the PPM Entities are "Senior Creditors" under the Subordination Agreement. (R. 52-1, Jackson's Index of Exs., Ex. 9, Subordinated Note at 3.) The Subordination Agreement governs the relative priority of the Senior Creditors' and Norandal's security interests in Scottsboro's assets. (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 29; R. 62-1, Norandal's Rule 56.1(b)(3)(A) Response ¶ 29.) The Subordination Agreement gives Jackson and the PPM Entities senior security interests in Scottsboro's assets, and Norandal a junior security interest in substantially the same assets.[2] (*Id.* ¶¶ 19, 29, 31.) The parties executed the Subordination Agreement "[a]s an inducement to and as one of the conditions precedent to" Jackson's extension of credit to Scottsboro under the Credit Agreement. (*Id.* ¶ 59.) The Subordination Agreement is governed by Illinois law. (*Id.* ¶ 30.)

Thompson, Hine & Flory ("Thompson") represented Norandal in the Scottsboro Acquisition. (*Id.* ¶ 27.) Thomspon reviewed a draft of the Subordination Agreement[3] and suggested changes to the draft, including the addition of a provision that would require Jackson to provide Norandal with notice of any default by Scottsboro under the Credit Agreement. (*Id.* ¶¶ 35, 38.) Latham & Watkins, counsel to Jackson and the PPM Entities, refused to include the

---

[2] Norandal, however, has a senior security interest in Scottsboro's spare parts that existed as of February 29, 1999. (*Id.* ¶ 31.)

[3] In addition to having outside counsel review the Subordination Agreement, Norandal Aluminum's Treasurer reviewed it and commented that it was not an unusual document. (*Id.* ¶ 58.)

senior notice default provision. (*Id.* ¶¶ 38, 41.) Norandal nevertheless executed the Subordination Agreement. (*Id.* ¶ 60.)

The Subordination Agreement contains a definition of "Senior Default Notice."[4] (*Id.* ¶ 42.) The language in the definition of "Senior Default Notice" specifically refers to Scottsboro. (*Id.* ¶ 44.) The term "Senior Default Notice" does not appear anywhere else in the Subordination Agreement, and it is not employed in any substantive paragraph. (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶¶ 44, 45.) The Subordination Agreement also defines "*Subordinated Default Notice.*" (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 45; R. 62-1, Norandal's Rule 56.1(b)(3)(A) Response ¶ 45.) In contrast to the term "Senior Default Notice," the term "Subordinated Default Notice" appears elsewhere in the Subordination Agreement, and requires *Nordanal* to notify Jackson of any Scottsboro default under the Subordinated Note. (*Id.*)

## IV. Scottsboro's Defaults Under the Credit Agreement

John Krupinski, the former Chief Financial Officer ("CFO") of Scottsboro from October 1999 through Scottsboro's bankruptcy proceedings, served as Jackson's Rule 30(b)(6) witness on several topics, including the Events of Default under the Credit Agreement. (*Id.* ¶ 71.) Krupinski testified that beginning in October 1999 (the "Default Date") and until at least August 1, 2001, Scottsboro defaulted on several of its Senior Debt obligations to Jackson, with each breach resulting in an Event of Default under Section 8.1(b) of the Credit Agreement. (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶¶ 75-89.) Specifically, Krupinski testified that these

---

[4] The Subordination Agreement provides that "'Senior Default Notice' shall mean a written notice from Agent, Collateral Agent, or any other Senior Creditor to Subordinated Creditors, with a copy to Scottsboro LLC on behalf of the Borrowers, pursuant to which Subordinated Creditors are notified of the occurrence of a Senior Default." (R. 52-1, Jackson's Index of Exs., Ex. 9, Subordinated Note at 3.)

defaults included defaults regarding financial covenants, affiliate transactions, payments, a labor strike, audited financial statements, tax distributions to equity holders, and net borrowing availability. (*Id.* ¶¶ 71-88.)

Jackson first notified Scottsboro of a Senior Default on December 13, 2000 -- over one year after the first alleged default date. (R. 62-1, Norandal's Rule 56.1(b)(3)(B) Statement of Additional Facts ¶ 31; R. 74-1, Jackson and the PPM Funds' Reply to Norandal's Local Rule 56.1 Statement of Additional Facts That Require The Denial of Pl. and Counterdefs.' Mots. for Summ. J. ("Jackson's Rule 56.1(a)(3) Reply") ¶ 31.) Jackson first notified Norandal of a Senior Default by letter dated July 27, 2001. (*Id.* ¶ 9.)

## V.    The Limited Waiver Letter

Jeff Podwika, the PPM Finance loan officer responsible for the Scottsboro loan from February 1999 through January 2001, sent Scottsboro a letter dated December 31, 1999 (the "Limited Waiver Letter"). (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 90; R. 62-1, Norandal's Rule 56.1(b)(3)(A) Response ¶ 90.) The Limited Waiver Letter provides in relevant part:

> During the period from the date hereof through May 31, 2000, Jackson and Agent hereby waive the minimum Net Borrowing Availability restriction . . . solely to the extent such restriction would prohibit (1) the making of scheduled payments of interest and principal on an unaccelerated basis with respect to the [Subordinated Note] . . . . This Limited Waiver shall be limited precisely as written and shall not be deemed or otherwise construed to waive or amend any provision of the Credit Agreement.

(*Id.* 91.) The Limited Waiver Letter was sent only to Scottsboro, not to Norandal or any other party. (*Id.* 93.)

## VI.    The April 26, 2000 Amendment

On April 26, 2000, Jackson loaned Scottsboro an additional $5.25 million.  (R. 62-1,

Norandal's Rule 56.1(b)(3)(B) Statement of Additional Facts ¶ 30; R. 74-1, Jackson's Rule

56.1(a)(3) Reply ¶ 30.)  In connection with the loan, Scottsboro, Jackson, and PPM Finance

executed a "Consent and Amendment to the Credit Agreement" (the "April 26, 2000

Amendment").  (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 94; R. 62-1, Norandal's Rule

56.1(b)(3)(A) Response ¶ 94.)  Section 6 of the April 26, 2000 Amendment, entitled "Limited

Waiver," pertains to a waiver of certain financial covenants for the fiscal year ending December

31, 1999.  (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 95.)  Section 6 of the April 26, 2000

Amendment provides, in relevant part:

> Agent and Lender hereby waive the existing Events of Default under Section
> 8.1(b) of the Credit Agreement arising solely due to Borrowers' failure to comply
> with paragraphs (a), (b), (c), and (d) of Annex G (Financial Covenants to the
> Credit Agreement) for the testing periods ending on December 31, 1999;
> provided, that such waiver shall be conditional and shall be deemed void *ab initio*
> and of no force and effect (and Agent and Lenders shall be entitled to exercise all
> rights and remedies under the Loan Documents or otherwise as a result of such
> Events of Default, all of which rights and remedies are hereby expressly reserved
> in the event such waiver is deemed void) if Agent shall determine that: Capital
> Expenditures made by Borrowers and their Subsidiaries on a combined basis from
> the Closing Date through the last day of Fiscal Year 1999 exceeded $5,298,000
> . . .

(R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 98; R. 62-1, Norandal's Rule 56.1(b)(3)(A)

Response ¶ 98.)  To avoid nullfying *ab initio* the conditional waiver, "Capital Expenditures made

by [the Scottsboro Entities] and their Subsidiaries on a combined basis from [February 26, 1999]

through [December 31, 1999] [could not] exceed $5,298,000."  (*Id.* ¶ 99.)  Upon audit,

Scottsboro's Capital Expenditures for the 1999 fiscal year (*i.e.*, the time frame referenced in

Section 6 of the April 26, 2000 Amendment) were above $6 million, and therefore failed to meet one of the conditions for the effectiveness of the conditional waiver. (*Id.* ¶ 100.)

**VII.   Scottsboro's Bankruptcy Proceedings**

Jackson and the PPM Entities filed involuntary petitions for relief under Chapter 11 of the Bankruptcy Code against Scottsboro on August 1, 2001 in the United States Bankruptcy Court for the Northern District of Illinois. (*Id.* ¶ 103.) As of the bankruptcy filing date, the outstanding aggregate amount that Scottsboro owed Jackson under the Credit Agreement exceeded $55 million, and the amount that Scottsboro owed the PPM Entities under the relevant loan agreements exceeded $14 million. (*Id.* ¶¶ 105, 106.) On August 14, 2001, the Bankruptcy Court entered orders for relief. (*Id.* ¶ 107.) The Bankruptcy Court found that Jackson held a first priority security interest in substantially all of Scottsboro's assets. (*Id.* ¶ 109.)

On November 5, 2002, Jackson filed this complaint against Norandal. (*Id.* ¶ 124.) On January 15, 2003, Norandal filed in both the Bankruptcy Court and this Court identical Motions to Enforce Settlement Agreement and supporting papers, in which Norandal asserted that Jackson's attorney Forrest B. Lammiman confirmed in writing on September 19, 2002 that Jackson agreed to the proposed terms of a global settlement and that two of Norandal's attorneys confirmed certain terms of a settlement agreement with Lammiman over the telephone on September 25, 2002. (*Id.* ¶ 126.) In his September 19, 2002 letter, Lammiman states in pertinent part that "we are prepared to settle upon the basis of the economic terms set forth therein, *subject to definitive documentation.*" (*Id.* ¶ 127 (emphasis added).) In an email dated September 27, 2002, Lammiman notified Norandal's attorney John S. Delnero that "I also need to talk to my client rep., who is not in the office this week, as it turns out.  In any event, pl. be advised that I

9

doubt that Jackson will be able or willing to give the general release you and Gerald requested in our telephone conversation." (*Id.* ¶ 129.)

On February 27, 2003, Chief Bankruptcy Judge Wedoff orally denied Norandal's Motion to Enforce Settlement. (*Id.* ¶ 134.) Judge Wedoff stated: "I believe that there is not a binding settlement. The parties had anticipated that there would be a written document that would specify the terms of a release. No such written document ever came into existence." (*Id.*)

## ANALYSIS

The primary issue in this case is whether the Subordination Agreement requires Norandal to remit to Jackson payments that Scottsboro made to Norandal while Scottsboro defaulted under the Credit Agreement, where Jackson did not promptly notify Norandal of any default. This raises an issue of contract interpretation and the parties' respective obligations under the terms of their contracts.

Contract interpretation, including the preliminary question of whether a contract is ambiguous, is a question of law. *ECHO, Inc. v. Whitson Co., Inc.,* 52 F.3d 702, 705 (7th Cir. 1995). "[C]ontract interpretation is particularly suited for disposition on summary judgment." *United States v. 4500 Audek Model No. 5601 AM/FM Clock Radios*, 220 F.3d 539, 543 (7th Cir. 2000).

The primary objective in construing a contract is to give effect to the parties' intent. *Home Ins. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d 763, 767 (7th Cir. 1995). "[I]f a contract is clear on its face and the text contains no clue that the contract might mean something different from what it says, then the inquiry is over -- no evidence outside of the contract may be considered." *Id.* at 767. Thus, the threshold inquiry is whether the contract is ambiguous on its

10

face. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). A contract is intrinsically ambiguous if the contract language is reasonably susceptible to more than one meaning. *Id.* A contract is not ambiguous simply because the parties do not agree on the meaning of its terms. *Id.*

"The parties to a subordination agreement normally consist of a 'common debtor' who owes a debt to two creditors or two groups of creditors, a creditor known as the 'junior creditor' that agrees to subordinate its debt to the debt of another creditor, and a 'senior creditor' that benefits from the subordination agreement and acquires priority over the junior creditor. Such agreements are routinely entered into by one creditor to induce another to extend additional credit to the debtor." *In re Chicago, South Shore and South Bend R.R.*, 146 B.R. 421, 426 (Bankr. N.D. Ill. 1992) (citation omitted). "A subordination agreement '. . . is nothing more than a contractual modification of lien priorities and must be construed according to the expressed intention of the parties and its terms.'" *Id.* (citation omitted).

The parties dispute the meaning of Sections 2.3 and 2.5 of the Subordination Agreement. Section 2.3 of the Subordination Agreement provides:

> Notwithstanding any provision of any Subordinated Debt Document to the contrary, *no Obligor [Scottsboro] may make, and no Subordinated Creditor [Norandal] may receive, accept or retain any payment of principal,* interest or any other amount with respect to the Subordinated Debt [the Subordinated Note] *until the Senior Debt is paid in full in cash* and all commitments to make loans and issue letters of credit under the Senior Debt Documents [the Credit Agreement] are terminated, *except that,* (i) subject to Section 2.2 above, *[Scottsboro] may make, and Subordinated Creditors may receive scheduled payments of principal and interest* (at the applicable rate in the absence of a Subordinated Default) under the Subordinated Note on an unaccelerated basis *so long as no Senior Default shall have occurred and be continuing or would result therefrom* and (ii) Subordinated Creditors may receive proceeds of any sale of Spare Parts in a Proceeding as provided in Section 2.2.

11

(R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 39; R. 62-1, Norandal's Rule 56.1(b)(3)(A)

Response ¶ 39 (emphases added).)  Section 2.5 of the Subordination Agreement provides:

> If any *payment or distribution* on account of the [Subordinated Note] *not
> permitted to be made by any Obligor [Scottsboro] or received by any
> Subordinated Creditor [Norandal] under this Agreement* is received by any
> Subordinated Creditor before all Senior Debt is paid in full in cash, *such payment
> or distribution shall not be commingled with any assets of Subordinated Creditor,
> shall be held in trust* by such Subordinated Creditor for the benefit of the Senior
> Creditors [Jackson, PPM Fund and PPM CBO II] *and shall be promptly paid over
> to the Senior Creditors,* or their representatives, for application on a pro rata basis
> (subject to the terms of any intercreditor agreement among the Senior Creditors)
> to the payment of the Senior Debt then remaining unpaid, until all of the Senior
> Debt is paid in full in cash.

(*Id.* ¶ 54 (emphases added).)

I.    **The Subordinated Agreement Unambiguously Requires Norandal To Remit To
      Jackson Payments That Scottsboro Made To Norandal While Scottsboro Was In
      Default On Its Senior Debt Obligations**

            A.    **Payments Are "Permitted To Be Made . . . Or Received" If They Are
                  Permitted "Under The Agreement"**

The parties agree that Section 2.5 of the Subordination Agreement applies only to

payments that were "not permitted to be made."  The parties disagree, however, as to who or

what may serve as the source of that permission.  Norandal argues that a payment may be

"permitted" by Jackson's words or actions.  Jackson argues that a payment may be "permitted"

only if it complies with the terms of the Subordination Agreement.  At issue is the language of

Section 2.5 regarding "payment[s] . . . not permitted to be made by any Obligor or received by

any Subordinated Creditor under this Agreement," and whether the phrase "under this

Agreement" modifies "any Subordinated Creditor" or "payment . . . not permitted to be made."

Norandal argues that "under this Agreement" modifies "any Subordinated Creditor" to

12

make clear that "the party receiving an 'incorrect' payment need not be Norandal, but can be 'any Subordinated Creditor under this Agreement.'" (R. 63-1, Norandal's Mem. of Law in Opp. to Mots. for Summ. J. ("Norandal's Opp. Mem.") at 10 n.5.) Norandal urges that the last antecedent rule of contract interpretation requires this interpretation, because "any Subordinated Creditor" immediately precedes "under this Agreement." Thus, under Norandal's interpretation, the source of permission for a "payment . . . permitted to be made" is Jackson. It is undisputed that Jackson continued to loan Scottsboro funds after the Default Date and that Scottsboro used those funds to make the payments at issue to Norandal. Norandal contends that Jackson thereby "specifically authorized" those payments, rendering them "permitted" under Section 2.5 and thus rightfully belonging to Norandal.

Jackson argues that "under this Agreement" modifies "payment . . . permitted to be made." Jackson contends that the plain language of Section 2.5 makes clear that payments are "permitted to be made" only if they do violate the "Agreement," specifically, Section 2.3 of the Subordination Agreement. Section 2.3 governs the circumstances under which Norandal may "accept, receive, or retain" payments. Thus, Jackson argues, the source of permission for payments that are "permitted to be made" is the Subordination Agreement itself, not Jackson. The Court agrees.

Norandal attempts to create an ambiguity in Section 2.5 where none exists. First, it is unclear why Norandal thinks it would be necessary to distinguish Subordinated Creditors "under this Agreement" from some other subordinated creditors not mentioned in the Agreement. The term "Subordinated Creditor" is specifically defined elsewhere in the Subordination Agreement as including not only Norandal but also "all subsequent holders of the Subordinated Debt." (R.

13

52-1, Jackson's Index of Exs., Ex. 9, Subordinated Note at 3.) Thus, the phrase "under this Agreement" is redundant and rendered meaningless by applying it to modify a term that is already specifically defined. *See Carroll v. Acme-Cleveland Corp.*, 955 F.2d 1107, 1112 (7th Cir. 1992). Moreover, the Subordination Agreement uses the term "Subordinated Creditor" more than sixty times throughout the document without specifying that such reference is being made to Subordinated Creditors "under this Agreement." Finally, Norandal's reliance on the "last antecedent rule" is not persuasive. The last antecedent rule is merely a general canon of contract interpretation. The Court need not apply the rule mechanically, as urged by Norandal, where "there is something in the instrument requiring a different conclusion." *Forty-Eight Insulations, Inc. v. Acevedo*, 140 Ill. App. 3d 107, 115, 487 N.E.2d 1206, 211 (Ill. App. Ct. 1986) (citation omitted).

Sections 2.3 and 2.5 are susceptible to only one meaning. Section 2.5 applies when Norandal has received a payment on the Subordinated Note "not permitted to be made by [Scottsboro] or received by [Norandal] under this Agreement . . . ." Payments not permitted to be made "under this Agreement" are payments that are made or received in violation of Section 2.3. Under Section 2.3, Norandal cannot "receive, accept, or retain" any payment made by Scottsboro under the Subordinated Note when a Senior Default has occurred and is continuing. Thus, under the unambiguous language of Sections 2.3 and 2.5, a "payment . . . not permitted to be made . . . or received" is a payment that Scottsboro made to Norandal while Scottsboro was in default on its obligations to Jackson under the Credit Agreement and while the Senior Debt remained unpaid.

**B.     The Subordination Agreement Does Not Require Jackson Or The PPM Entities To Notify Norandal Of Any Senior Default**

Norandal argues that the Subordination Agreement requires Jackson to notify it in the event that Norandal received a payment from Scottsboro that was not "permitted to be made . . . or received," and that Jackson is not entitled to recover the payments because it failed to notify Norandal of any Senior Defaults until July 27, 2001.[5]

Jackson contends that the unambiguous language of the Subordination Agreement places no restrictions or limitations on Jackson's ability to recover payments from Norandal that Scottsboro made while it was in default under the Credit Agreement and the Senior Debt remained unpaid. Essentially, Jackson argues that the *existence* of a default, rather than Norandal's *actual notice* of a default, triggers Norandal's obligation to remit the payments to Jackson. The Court agrees.

**1.     The Unambiguous Language Of The Subordination Agreement Does Not Require Jackson To Notify Norandal Of A Senior Default**

Norandal argues that it could not have had any obligation to hold particular payments in trust before it had notice to do so. Norandal relies on the language of Section 2.5 and the definition of "Senior Default Notice."

Section 2.5 provides that in the event that Norandal receives a "payment . . . not permitted to be made . . . or received," that "such payment or distribution *shall not be commingled with any assets* of Subordinated Creditor, *shall be held in trust* by such Subordinated Creditor for the

_____

[5] Specifically, Norandal argues that such notice of a Senior Default is a precondition for imposing a trust upon those payments, and that Jackson's claims fail due to the non-occurrence of a condition precedent. (R. 37-1, Norandal's Answer and Affirmative Defenses at 13.) This is Norandal's Seventh Affirmative Defense.

benefit of the Senior Creditors [Jackson and PPM Entities] and *shall be promptly paid over* to the

Senior Creditors . . ." Norandal argues that Section 2.5 presumes that Norandal would receive

notice of a Senior Default because the requirement that such payments "shall not be

commingled" and "shall be held in trust" is "predicated upon Norandal having notice that the

payments at issue were 'incorrect' . . . [and that] Norandal had received notice that a particular

payment was 'incorrect.'" (R. 63-1, Norandal's Opp. Mem. at 11.)

Norandal misses the point. The terms of the Subordination Agreement itself put

Norandal on notice of its obligation to hold certain payments in trust that violate the

Subordination Agreement. The fact that Norandal did not have actual notice that particular

payments were not "permitted" under the Agreement is irrelevant because Norandal had the duty

to determine for itself (by asking Scottsboro or Jackson) whether Scottsboro defaulted and thus

whether particular payments were "permitted."

Norandal further argues that the Subordination Agreement would not have included a

definition of "Senior Default Notice" if such notice were not required. Norandal attacks

Jackson's explanation that the definition is a mere "dangling definition" leftover from a form

agreement given that it specifically refers to "Scottsboro."

It is undisputed, however, that the definition of "Senior Default Notice" itself does not

confer any substantive right. It is also undisputed that the term "Senior Default Notice" does not

appear in any substantive paragraph of the Subordination Agreement. Moreover, the

Subordination Agreement defines the term "*Subordinated* Default Notice," which, in contrast to

the term "Senior Default Notice," appears elsewhere in the Subordination Agreement, and

explicitly requires *Nordanal* to notify Jackson of any Scottsboro default under the Subordinated

16

Note. (R. 52-1, Jackson's Index of Exs., Ex. 9, Subordinated Note § 6.) If the parties intended to include a senior default notice provision in the Subordination Agreement, they would have explicitly done so.

In sum, nothing in the Subordinated Agreement requires Jackson to notify Norandal in the event of a Senior Default, and nothing that Jackson said or did relieves Norandal of its obligations to Jackson. Pursuant to Section 2.5, Norandal is not allowed to "receive, accept or retain" particular payments unless they were made when "no Senior Default shall have occurred and be continuing or would result therefrom . . . ," that is, when no Senior Default existed. Norandal had the burden of determining whether any Senior Defaults existed when it accepted those payments. Norandal never made any inquiry to Jackson or Scottsboro regarding the existence of any defaults under the Credit Agreement. Instead, Norandal remained ignorant of the existence of any default.[6]

### 2. Jackson Rejected Norandal's Counsel's Request For A Senior Default Notice Provision

Counsel represented Norandal in connection with the negotiation of the Subordination Agreement. Norandal's counsel reviewed a draft of the Subordination Agreement and specifically requested that Jackson include a senior default notice provision. Jackson refused that request. Norandal nonetheless executed the Subordination Agreement. Thus, Norandal clearly knew that the Subordination Agreement did not contain a senior default notice provision when it executed the contract. It cannot now rewrite the Agreement to include a provision for which it

---

[6] After the closing of the Scottsboro Acquisition, the parties had no communications or dealings with one another until the eve of Scottsboro's bankruptcy in July 2001. (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶¶ 69-70; R. 62-1, Norandal's Rule 56.1(b)(3)(A) Response ¶¶ 69-70.)

specifically -- but unsuccessfully -- negotiated.

Accordingly, Norandal's affirmative defense that Jackson's claims are barred by the non-occurrence of a condition precedent has no merit.

### C. Scottsboro Defaulted On Its Obligations To Jackson Under The Credit Agreement

John Krupinski, Scottsboro's former CFO, testified that beginning in October 1999 and until at least August 1, 2001, Scottsboro defaulted on several of its Senior Debt obligations to Jackson. (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶¶ 75-89.) Each breach resulted in an Event of Default under Section 8.1(b) of the Credit Agreement. Specifically, Krupinski testified that these defaults included defaults regarding financial covenants, affiliate transactions, payments, a labor strike, audited financial statements, tax distributions to equity holders, and net borrowing availability.

Norandal argues that there is a genuine issue as to whether Scottsboro defaulted under the Credit Agreement because Krupinski's testimony allegedly lacks foundation. Norandal further argues that the December 31, 1999 Limited Waiver Letter, the April 26, 2000 Amendment, and the testimony of Jeff Podwika (the PPM Finance loan officer who sent the Limited Waiver Letter to Scottsboro), establish that no default occurred.

Norandal does not directly address the substance of Krupinski's testimony and the underlying facts establishing Scottsboro's defaults. Norandal does not dispute, for example, that Scottsboro failed to meet the minimum debt service coverage ratio for each month beginning in October 1999 through the filing date of the bankruptcy (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 75), that Scottsboro failed to meet the minimum interest coverage ratio for each

month (*id.* ¶ 76), that Scottsboro made capital expenditures in excess of $5,000,000 during the 1999 Fiscal Year (*id.* ¶ 78), or that Scottsboro made undisclosed sales of inventory to an affiliate and failed to disclose such sales in advance to PPM and Jackson. (*Id.* ¶ 79). Norandal does not dispute that "Events of Default" are set forth in Section 8.1(b) of the Agreement. Because Norandal fails to directly refute the underlying facts establishing Scottsboro's defaults, Norandal fails to establish a genuine issue of fact as to whether those defaults occurred.

Norandal appears to argue that Krupinski's testimony cannot form the basis of summary judgment because Krupinski lacked personal knowledge as to the facts to which he testified.[7] A Rule 30(b)(6) witness, however, need not have personal knowledge of the facts to which he testifies, because he testifies as to the corporation's position on the matters set forth in the Rule 30(b)(6), not his personal opinion. *Calzaturficio v. Fabiano Shoe Co., Inc.*, 201 F.R.D. 33, 37 (D. Mass. 2001).

In accordance with Rule 30(b)(6), Jackson and the PPM Entities prepared Krupinski to give complete, knowledgeable, and binding answers for the topics for which he was the corporate designee. As part of that preparation, Krupinski reviewed a spreadsheet detailing Scottsboro's financial condition throughout the relevant time period. Norandal complains that Krupinski did not personally prepare the spreadsheet and did not have personal knowledge of its contents. Krupinski's personal knowledge, however, is not necessary. *Ierardi v. Lorillard*, No. Civ. A. 90-

---

[7] Norandal also argues that Krupinksi gave improper expert testimony in violation of *Daubert v. Merrell Dow Pharms., Inc.*, 516 U.S. 869, 116 S. Ct. 189 (1995) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999). This argument is not properly before the Court because Norandal raised it in its Response to Jackson's Local Rule 56.1 Statement of Facts. Legal argument does not belong in a Rule 56.1(b)(3)(A) response. L.R. 56.1(b)(3)(A). Accordingly, the Court need not address this argument.

7049, 1991 WL 158911, at *1 (E.D. Pa. Aug. 13, 1991) ("[A]n individual employee's lack of personal knowledge is irrelevant."). By providing Krupinski with the data in the spreadsheet, Jackson and the PPM Entities fulfilled their duty to present and prepare a Rule 30(b)(6) designee to provide testimony beyond matters of his personal knowledge. *United States v. Taylor*, 166 F.R.D. 356, 360 (M.D.N.C. 1996) ("If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obliged to prepare the designees so that they may give knowledgeable and binding answers for the corporation."); *see also Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 338, 343 (N.D. Ill. 1995) (noting that the duty to present and prepare a corporate designee goes beyond matters personally known to that designee).

Norandal contends that the testimony of Jeff Podwika refutes Krupinski's testimony and establishes that no defaults occurred. Podwika is the PPM Finance loan officer who sent Scottsboro the Limited Waiver Letter dated December 31, 1999. Podwika testified that "we send out waivers because we are comfortable with the situation or what occurred we have an understanding of it and we are willing to waive and move forward based on whatever terms are in that waiver." (R. 62-1, Norandal's Rule 56.1(b)(3)(B) Statement of Additional Facts ¶ 28.) Norandal argues that the Limited Waiver Letter establishes that PPM Finance was "comfortable with the situation" and that no default occurred.

Podwika further testified that if a default occurred, "[t]here would always be some communication. No matter what it was called, there would always be some communication with the borrower." (R. 62-1, Norandal's Rule 56.1(b)(3)(B) Statement of Additional Facts ¶ 32.) PPM Finance first notified Scottsboro of a default under the Credit Agreement on December 13,

2000. (*Id.* ¶ 31.) Norandal contends that no default occurred before December 13, 2000 because if there had been a default, Norandal argues, PPM Finance would have notified Scottsboro.

Podwika never stated, however, that "Scottsboro was not in default." Podwika simply does not refute the underlying facts of Krupinski's testimony establishing that defaults occurred.

Similarly, Norandal argues that PPM Finance would not have lent Scottsboro an additional $5.25 million if Scottsboro had been in default. The Subordination Agreement explicitly provides, however, that the "Senior Creditors may at any time . . . without impairing or releasing the obligations of the Subordinated Creditors under this Agreement, increase the amount of Senior Debt." (R. 52-1, Jackson's Index of Exs., Ex. 9, Subordinated Note § 3.) Norandal cites no evidence to support its arguments. Again, the fact that PPM Finance loaned Scottsboro additional funds does not refute Krupinski's testimony that Scottsboro defaulted.

Finally, Norandal's argument that a default must be "material" in order to trigger Norandal's obligation to hold the payments in trust is nonsensical. Norandal argues that a party seeking to be excused from its own contractual obligations due to another party's breach must demonstrate that the breach was material, and that accordingly Jackson may not renege on its "contractual obligations to fund Scottsboro's payments to Norandal" without demonstrating that Scottsboro's alleged defaults were material. First, the Subordination Agreement does not require Events of Default to be "material." Second, Jackson does not owe an affirmative duty to "fund Scottsboro's payments to Norandal" under the Subordination Agreement. There is no such duty flowing to Norandal under the Subordination Agreement. Jackson is not asking the Court to excuse it from its own contractual obligations to Scottsboro under the Credit Agreement. Rather, it is seeking to enforce its rights against Norandal under the Subordination Agreement. Jackson

21

need not demonstrate that Scottsboro's defaults were "material."

In sum, the unambiguous terms of the Subordination Agreement require Norandal to remit to Jackson the payments Scottsboro made to Norandal while Scottsboro was in default under the Credit Agreement. Because Scottsboro defaulted on its debt obligations to Jackson, and because Norandal failed to remit those payments to Jackson, Norandal breached the contract.

Accordingly, summary judgment is granted in favor of Jackson on both counts of its amended complaint.

## II. Norandal's Affirmative Defenses Have No Merit

### A. Jackson Did Not Waive Its Right To Recover The Payments Under The Subordination Agreement

Norandal argues that Jackson waived its right to recover the payments because it "specifically authorized" Scottsboro to make those payments to Norandal, thereby intentionally relinquishing a known right. This is Norandal's Second Affirmative Defense.

Under Illinois law, "waiver" is the voluntary and intentional relinquishment of a known right. *See United States v. Sumner*, 265 F.3d 532, 537 (7th Cir. 2001). "The party claiming an implied waiver has the burden of proving a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." *In re Nitz*, 317 Ill. App. 3d 119, 130, 739 N.E.2d 93, 103 (Ill. App. Ct. 2000). Where the evidence regarding a party's conduct during the relevant period is undisputed, the Court may determine waiver as a matter of law. *Wald v. Chicago Shippers Assoc.*, 175 Ill. App. 3d 607, 621, 529 N.E.2d 1138, 1148 (Ill. App. Ct. 1988).

22

1.  **The Subordination Agreement Has An Enforceable Non-Waiver Clause**

Non-waiver clauses are enforceable under Illinois law. *Monarch Coaches, Inc. v. ITT Indus. Credit*, 818 F.2d 11, 13 (7th Cir. 1987); *McDonald's Corp. v. C.B. Management Co.*, 13 F. Supp. 2d 705, 712 (N.D. Ill. 1998). Non-waiver clauses "may be strictly construed even when full compliance with the contract has not been required for a lengthy period of time." *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 277 (7th Cir. 1996). Such clauses are strictly enforceable under Illinois law, though they may be "waived by [the] words and deeds of the parties, so long as the waiver is proved by clear and convincing evidence." *Id.* (citation omitted).

The Subordination Agreement provides:

> *Any failure or delay on the part of any party in exercising any such right*, remedy, or power, or abandonment or discontinuance of steps to enforce the same, *shall not operate as a waiver thereof* or affect the rights of the affected party thereafter to exercise the same.

(R. 52-1, Jackson's Index of Exs., Ex. 9, Subordinated Note § 7) (emphases added).) Section 8 further provides that any waiver must be made in writing:

> *Any modification or waiver of any provision of this Agreement*, or any consent to any departure by any party therefrom, *shall not be effective in any event unless the same is in writing* and signed by Agent or Collateral Agent (or their respective successors and assigns), Purchasers (or their respective successors and assigns) and Holder, and then such modification, waiver, or consent shall be effective only in the specific instance and for the specific purpose given.

(*Id.* § 8 (emphases added).) In addition, the Subordination Agreement provides that its terms shall not be "affected, modified or impaired in any manner" by any amendment or modification of the Credit Agreement or other Senior Debt Document or by "any exercise or non-exercise of any right, power or remedy under or in respect of the Senior Debt or the Subordinated Debt . . ."

(*Id.* § 8.)

## 2.   Jackson's Actions Do Not Constitute A Waiver

Norandal argues that Jackson waived its rights by "permitting" Scottsboro to make the payments to Norandal, providing the funding to Scottsboro to make those payments, and making no effort to compel Norandal to hold such payments in trust.

There is no waiver. Jackson did not "specifically authorize" or "permit" Scottsboro to make the payments. As discussed above, payments are "permitted" under the Subordination Agreement only if they do not violate Section 2.3. Neither the Limited Waiver Letter nor the April 26, 2000 Amendment constitutes the requisite "permission."

Moreover, the Subordination Agreement makes clear that Jackson's failure to enforce any rights under the Agreement "shall not operate as a waiver thereof," and that any purported waiver is effective only if it is in writing and signed by PPM Finance and Norandal. It is undisputed that there is no writing signed by the parties expressly waiving Jackson's right to recover those payments. Neither the Limited Waiver Letter nor the April 26, 2000 Amendment expressly waived or even referred to the non-waiver provisions of the Surbordination Agreement.

Norandal argues that Jackson waived its right to the payments by loaning Scottsboro an additional $5.25 million after the Default Date and executing the April 26, 2000 Amendment. But Section 3 of the Subordination Agreement explicitly allowed Jackson to loan additional funds to Scottsboro and increase the amount of Senior Debt without affecting Norandal's obligations under the Subordination Agreement. (R. 52-1, Jackson's Index of Exs., Ex. 9, Subordinated Note § 3.) Jackson's exercise of its explicit rights under the Subordination Agreement does not constitute a wavier.

24

Norandal mischaracterizes the terms of the April 26, 2000 Amendment by arguing that Jackson explicitly waived all Senior Defaults that had already occurred. For support, Norandal cites section 4.2 of the April 26, 2000 Amendment, which provides:

> After giving effect to the issue and sale of the Senior Floating Rate Term Notes, no Default or Event of Default shall have occurred and be continuing. No event or condition shall exist which has had or could reasonably be expected to have a Material Adverse Effect.

(R. 52-1, Jackson's Index of Exs., Ex. 13, April 26, 2000 Amendment § 4.2.) Section 4.2 does not, as Norandal argues, excuse Scottboro's then-existing defaults. Rather, Section 4.2 sets forth a *condition* that must be met in order for the April 26, 2000 Amendment to be effective. Section 4 explicitly provides that "The effectiveness of this Agreement is subject to the fulfillment to Agent's and Lender's satisfaction, on or prior to the date hereof, of the following conditions." (R. 52-1, Jackson's Index of Exs., Ex. 13, April 26, 2000 Amendment § 4.) Section 4.2 is one of those conditions. The April 26, 2000 Amendment's plain language makes clear that it does not operate as a waiver of all Scottsboro defaults.[8]

Norandal's affirmative defense of waiver has no merit.

## B. The Subordination Agreement Is Not An Unenforceable Contract Of Adhesion

Norandal argues that the Subordination Agreement is an unenforceable contract of

---

[8] Moreover, at least one other condition of the April 26, 2000 Amendment had not been met. To avoid nullfying the conditional waiver *ab initio*, "Capital Expenditures made by [the Scottsboro Entities] and their Subsidiaries on a combined basis from [February 26, 1999] through [December 31, 1999] [could not] exceed $5,298,000." (R. 52-1, Jackson's Index of Exs., Ex. 13, April 26, 2000 Amendment § 6.) It is undisputed that upon audit, Scottsboro's Capital Expenditures for the 1999 fiscal year (*i.e.*, the time frame referenced in Section 6 of the April 26, 2000 Amendment) were above $6 million, and that therefore one of the conditions for the effectiveness of the conditional waiver had not been met.

adhesion because it was presented to Norandal on a "take it or leave it" basis with no opportunity for actual negotiation. This is Norandal's Tenth Affirmative Defense.

A contract of adhesion is a form agreement submitted to a party for acceptance without any opportunity to negotiate its terms. *Northwestern Nat. Ins. Co. v. Donovan*, 916 F.2d 372, 377 (7th Cir. 1990). A contract is not a contract of adhesion simply because one party may have had little relative bargaining power regarding the terms of the contract. *Id.*; *Bastian v. Wausau Homes, Inc.*, 635 F. Supp. 201, 203-04 (N.D. Ill. 1986). "Similarly situated parties seeking to void a term as adhesive have been rebuffed by Illinois courts." *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987).

The Subordination Agreement is not a contract of adhesion. Norandal, as part of a multi-national corporation, is a sophisticated party. It had competent counsel representing it during contract negotiations. Norandal entered into the Subordination Agreement to "induce" the Senior Lenders to fund the bulk of the $92 million transaction and to allow the sale to proceed. Norandal's counsel requested specific changes that Jackson's counsel refused to make, and the parties nonetheless executed the contract. Negotiation occurred, but Norandal's counsel was simply unsuccessful. Norandal's affirmative defense that the Subordination Agreement is an unenforceable contract of adhesion has no merit.

### C.   Norandal Is Not A Holder In Due Course Because It Had Notice Of Its Obligations

Norandal argues that it is a holder in due course with respect to the payments at issue.[9] A "holder in due course" is one who takes a negotiable instrument for value, in good faith, and

---

[9] This is Norandal's Sixth Affirmative Defense, and part of Count I of Norandal's counterclaim.

without notice of any claims or defenses to the instrument. *See* 810 Ill. Comp. Stat. 5/3-302 (West 2003); *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 619-20 (7th Cir. 2001). In Illinois, a party has "notice" of a fact when: "(a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know it exists." 810 Ill. Comp. Stat. 5/1-201(25) (West 2003).

Norandal is not a holder in due course. Norandal had reason to know, through the unambiguous terms of the Subordination Agreement, that, until Scottsboro paid the Senior Debt in full, Jackson had a claim to Scottsboro's payments to Norandal if Scottsboro made such payments in default under the Credit Agreement. Norandal is not an innocent third party with no notice of any other claim. It expressly contracted with Jackson to remit to Jackson any Subordinated Note payments made to Norandal while Scottsboro was in default under the Credit Agreement. The Subordination Agreement itself put Norandal on notice of its obligation to hold payments in trust that were not "permitted" under the Agreement, because, as discussed above, the Subordination Agreement placed the burden on Norandal to determine whether any payments were not "permitted." Norandal's affirmative defense has no merit.

**D.      The Parties Did Not Enter Into a Global Settlement**

Norandal asserts as its Ninth Affirmative Defense that Jackson and PPM Finance have no claims against Norandal because the parties entered into a global settlement in which Jackson and PPM Finance released Norandal from all claims related to the payments at issue. Jackson argues that Norandal presented the identical argument to Chief Bankruptcy Judge Wedoff in the adversarial bankruptcy proceedings, who ruled that there was no global settlement. In any event,

27

Jackson argues, there was no global settlement on the merits because the parties never formalized their discussions with definitive documentation. The Court agrees with Jackson.

### 1. Norandal Is Collaterally Estopped From Arguing That There Was a Global Settlement

Collateral estoppel precludes litigation of an issue "if the following conditions are met: (1) the issue sought to be precluded is the same as that involved in the prior action, (2) the issue was actually litigated, (3) the determination of the issue was essential to the final judgment, and (4) the party against whom estoppel is invoked was represented in the prior action." *Adair v. Sherman*, 230 F.3d 890, 893 (7th Cir. 2000).

Norandal argues that the parties reached a global settlement through the September 19, 2002 exchange of letters between Norandal's counsel and Jackson's counsel. Norandal presented this same argument in the adversary proceeding then pending before Judge Wedoff. Norandal filed identical Motions to Enforce Settlement in this case and in the bankruptcy proceeding, and elected to have its motion proceed before Judge Wedoff instead of before this Court. (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶¶ 126, 131; R. 62-1, Norandal's Rule 56.1(b)(3)(A) Response ¶¶ 126, 131.) The parties fully briefed Norandal's Motion to Enforce Settlement. Judge Wedoff orally ruled that "I believe that there is not a binding settlement. The parties had anticipated that there would be a written document that would specify the terms of a release. No such written document ever came into existence." (*Id.* ¶ 134.)

The only question is whether Judge Wedoff's oral ruling constituted a final judgment because it is undisputed that Norandal was represented in the earlier proceeding, that the issue was decided on the merits, and that the issue was identical. The adversary cases in Scottsboro's

28

bankruptcy were eventually settled by a separate and undisputed settlement agreement between the parties and were dismissed without prejudice. Norandal argues that the voluntary settlement rendered the bankruptcy proceedings a nullity and that Judge Wedoff's ruling has no effect on this case because there was no "final judgement" resolving the case.

Norandal confuses the standards for appealability with the standards for collateral estoppel. "To be 'final' for purposes of collateral estoppel the decision need only be immune, as a practical matter, to reversal or amendment. 'Finality' in the sense of 28 U.S.C. § 1291 is not required." *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 996 (7th Cir. 1979). Judge Wedoff's ruling may have been interlocutory and not immediately appealable, but it still has preclusive effect. *Gilldorn Savs. Ass'n v. Commerce Savs. Ass'n*, 804 F.2d 390, 393-94 (7th Cir.1986); *Illinois Bell Tel. Co. v. Haines & Co., Inc.*, 713 F. Supp. 1122, 1124-25 (N.D. Ill. 1989). Collateral estoppel bars Norandal from relitigating the issue of a global settlement in this case.

### 2. On The Merits, No Binding Settlement Contract Between Norandal And Jackson Existed

In any event, the undisputed facts establish that the parties did not enter into a global settlement. The September 19, 2002 exchange of letters between John Delnero, representing Norandal, and Forrest Lammiman, representing Jackson, do not reflect a meeting of the minds regarding settlement. Lammiman's September 19, 2002 reply letter to Delnero is expressly conditioned on documenting the parties' purported agreement: "[W]e are prepared to settle upon the basis of the economic terms set forth [in Delnero's September 19, 2002 letter], subject to

29

definitive documentation."[10] (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 127.) An exchange of letters about contract terms does not create a contract where the negotiations are "subject to" the execution of a written agreement: "When parties make a pact 'subject to' the execution of a later agreement, they manifest an intent not to be bound by the original pact." *Cohen Dev. Co. v. JMJ Properties, Inc.*, 317 F.3d 729, 735 (7th Cir. 2003). The parties failed to successfully negotiate a written agreement as required by Lammiman's letter. Accordingly, no binding settlement agreement exists.

Norandal argues for the first time in its opposition to Jackson's Motion for Summary Judgment that definitive documentation did in fact exist, in the form of a draft settlement agreement dated September 23, 2002. It is undisputed that the draft settlement agreement clearly contained a header noting that the document was a draft and that the transmittal email included language that the September 23, 2002 draft agreement would "have no effect on the parties until and unless it is fully executed by all the parties." It is also undisputed that the parties never executed the draft agreement. "[A] condition precedent requiring the execution of a definitive documentation is a condition precedent to formation, and thus, when unsatisfied, no contract exists in the first place." *In re Midway Airlines, Inc.*, 180 B.R. 851, 917 (Bankr. N.D. Ill. 1995); *Ceres Ill., Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 143-44, 500 N.E.2d 1, 5 (1986).

Norandal's affirmative defense that Jackson's claims are barred under the Subordination Agreement pursuant to a Settlement Agreement is without merit.

---

[10] Similarly, in an email to Delnero dated September 27, 2002, Lammiman cautioned that "I also need to talk to my client rep., who is not in the office this week, as it turns out. In any event, pl. be advised that I doubt that Jackson will be able or willing to give the general release you and Gerald requested in our telephone conversation." (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 129; R. 62-1, Norandal's Rule 56.1(b)(3)(A) Response ¶ 129.)

### E.    Equitable Estoppel Does Not Bar Jackson's Claims

Norandal argues that Jackson is equitably estopped from recovering any payments that Norandal received from Scottsboro under the Subordinated Note prior to July 27, 2001 because Jackson did not notify Norandal of any Senior Default until that date.

To prevail on its equitable estoppel counterclaim,[11] Norandal must establish six elements: (1) voluntary words or conduct by the estopped party amounting to a misrepresentation or concealment of material facts; (2) actual or implied knowledge of the estopped party that the representations were not true; (3) lack of knowledge of the true facts by the innocent party both at the time made or at the time acted upon; (4) intent, or a reasonable expectation, on the part of the estopped party that the innocent party would act on the misrepresentations; (5) a reasonable, good-faith, detrimental change of position by the innocent party based on the misrepresentations; and (6) prejudice to the innocent party. *Vaughn v. Speaker*, 126 Ill. 2d 150, 162-63, 533 N.E.2d 885, 890-91 (Ill. 1988).

Norandal argues that Jackson and the PPM Entities "concealed from Norandal the fact that any Senior Default existed prior to July 27, 2001." (R. 63-1, Norandal's Opp. Mem. at 26.) It is well-settled under Illinois law that there can be no concealment supporting an equitable estoppel claim unless there is an affirmative duty to speak. *Inland Metals Ref. Co. v. Ceres Marine Terminals, Inc.*, 557 F. Supp. 344, 349 (N.D. Ill. 1983). The Court has already determined that Jackson had no affirmative duty to notify Norandal of Senior Defaults. *See*

---

[11] Norandal asserts equitable estoppel as its Third Affirmative Defense and Count II of its counterclaim.

Section I.B. Because Norandal cannot establish the first element of equitable estoppel,[12] Count II of its counterclaim and its Fifth Affirmative Defense fail.

### F.      The Doctrine of Voluntary Payment Does Not Bar Jackson's Claims

"The voluntary payment doctrine is a corollary to the mistake of law doctrine and, in its general formulation, holds that a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution." *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 667 (7th Cir. 2001). Under the voluntary payment doctrine, "[a]bsent fraud, coercion or mistake of fact, monies paid under a claim or right to payment but under a mistake of law are not recoverable." *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 847, 658 N.E.2d 1325, 1330 (Ill. App. Ct. 1995).

Norandal argues that the voluntary payment doctrine precludes Jackson from recovering the payments at issue even though Jackson did not actually make those payments. Norandal contends that Jackson and PPM Finance "chose to permit and provide funding for Scottsboro Properties' making of Promissory Note payments to Norandal" (R. 44-2, Norandal's Mem. of Law in Supp. of its Mot. for Summ. J. at 12), and that this "conduct was the functional equivalent of making the payments on behalf of Scottsboro Properties." (R. 63-1, Norandal's Opp. Mem. at 18.) Norandal further contends that the voluntary payment doctrine extends beyond the realm of a contractual payor-payee relationship. The Court disagrees.

First, Jackson did not "permit" the payments to be made. Second, it is undisputed that

---

[12] Norandal fails to establish other elements of equitable estoppel as well. As to the fourth element, for example, Norandal could not have "in good faith, relied upon" Jackson's silence because it knew that Jackson refused to include a senior default notice requirement in the Subordination Agreement.

Scottsboro, not Jackson, made the payments. Norandal provides no authority to support its contention that a payor's *lender* becomes the payor when loan proceeds are used to make the payments at issue.

Third, Jackson was not contractually obligated to make the payments to Norandal because Jackson was not a party to the Subordinated Note. Norandal cites *Inland Real Estate Corp. v. Oak Park Trust and Sav. Bank*, 127 Ill. App. 3d 535, 469 N.E.2d 204 (Ill. App. Ct. 1983), to support its contention that Illinois courts have expanded the voluntary payment doctrine beyond the realm of a contractual relationship. *Inland* is inapposite for several reasons. First, *Inland* involved the voluntary-tax-payment doctrine, a distinct derivative of the voluntary payment doctrine. Second, the payor in *Inland* was contractually bound to make the payments. The payor in *Inland* was the assignee of a mortgage note who stood in the shoes of the assignor-mortgagor with regard to the rights and interests under the note and mortgage. The payor was therefore contractually obligated to make the tax payments at issue. *Id.* at 542, 469 N.E.2d at 209. Unlike the payor in *Inland*, Jackson was not contractually obligated to make the payments to Norandal.[13] The voluntary payment doctrine does not apply. Norandal's Fifth Affirmative Defense accordingly has no merit.

G.    **Laches Does Not Bar Jackson's Claims**

Norandal alleges that Jackson's claims are barred by the doctrine of laches because Jackson "slept on its rights" and delayed suing Norandal until three years after the alleged Default Date. This is Norandal's Fourth Affirmative Defense.

---

[13] Scottsboro, not Jackson, was contractually obligated to make payments to Norandal under the Subordinated Note.

33

Laches means a culpable delay in suing. *Teamsters & Employers Welfare Trust of Illinois v. Gorman Bros. Ready Mix*, 283 F.3d 877, 880 (7th Cir. 2002). A party asserting a laches defense must demonstrate: (1) an unreasonable lack of diligence by the party against whom the defense is asserted; and (2) prejudice arising therefrom. *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003). The Seventh Circuit has noted that "laches is a question of degree" and that "if only a short period of time has elapsed since the accrual of the claim, the magnitude of prejudice required before the suit should be barred is great." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002).

Courts generally determine the reasonableness of the alleged delay by reference to the statute of limitations. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999). In Illinois, the statute of limitations for actions involving written contracts is ten years after the date on which the cause of action accrued. 735 Ill. Comp. Stat. § 5/13-206 (West 2003).

Jackson has not unreasonably delayed in suing Norandal. Jackson's cause of action arguably accrued on November 1, 1999, when Norandal first received a Subordinated Note payment in violation of Section 2.3 of the Subordination Agreement. Jackson filed this complaint against Norandal three years later on November 5, 2002.[14] This is less than one-third of the statute of limitations period.

Moreover, during that three year period, Jackson did not sit idly by and exhibit an "unreasonable lack of diligence." Before resorting to litigation, Jackson first tried to collect the

---

[14] The Court further notes that Norandal expressly "acknowledge[d] that the provisions of this Agreement are intended to be enforceable *at all times*, whether before the commencement of, after the commencement of, in connection with or premised on the occurrence of a [bankruptcy] Proceeding." (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 51; R. 62-1, Norandal's Rule 56.1(b)(3)(A) Response ¶ 51) (emphasis added).)

balance due on the Credit Agreement from Scottsboro. When Scottsboro could not be sold as a going concern, Jackson credit bid for substantially all of Scottsboro's assets at an auction and then proceeded to sell off most of those assets. (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 114; R. 62-1, Norandal's Rule 56.1(b)(3)(A) Response ¶ 114.) Jackson also assisted the Bankruptcy Trustee in his pursuit of Scottsboro's accounts receivables, which led to the bankruptcy cases against Norandal. (*Id.* ¶¶ 120-121.) Those cases in turn led to this action.

The undisputed facts demonstrate that there was no unreasonable delay. Norandal's laches affirmative defense fails.

## H.   The Doctrine of Unclean Hands Does Not Bar Jackson's Claims

Norandal argues that Jackson violated its duty of good faith and fair dealing by failing to timely notify Norandal of Senior Defaults, and that Jackson is therefore barred from recovering the payments by the unclean hands doctrine. Norandal's unclean hands affirmative defense is "based on the grounds that [Jackson] acted wrongfully in failing to provide Norandal with notice of a Senior Default prior to July 27, 2001." (R. 63-1, Norandal's Opp. Mem. at 24-25.)

### 1.   The Implied Covenant Of Good Faith And Fair Dealing

Under Illinois law a covenant of good faith and fair dealing is implied in every contract unless expressly disavowed. *Dayan v. McDonald's Corp.,* 125 Ill. App. 3d 972 990, 466 N.E.2d 958, 971 (Ill. App. Ct. 1984). Good faith "requires that the party vested with contractual discretion exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties." *Northern Trust Co. v. VIII South Michigan Assocs.,* 276 Ill. App. 3d 355, 368, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995). However, "[p]arties are entitled to enforce the terms of negotiated contracts to the letter without

35

being mulcted for lack of good faith." *Perez v. Citicorp Mortgage, Inc.*, 301 Ill. App. 3d 413, 423-24, 703 N.E.2d 518, 525 (Ill. App. Ct. 1998).

Norandal argues that the implied covenant of good faith and fair dealing exists in the Subordination Agreement "by virtue of [Jackson's] discretion created by the inclusion of the 'Senior Default Notice' definition." (R. 63-1, Norandal's Opp. Mem. at 29.) Norandal argues that the definition of "Senior Default Notice" vests Jackson with discretion "as to when and how [Jackson] would notify Norandal that a Senior Default had taken place." (*Id.* at 28.) Norandal contends that by failing to timely notify it that a Senior Default had occurred, Jackson acted unreasonably and violated the implied covenant of good faith and fair dealing.

This argument is misguided because the implied covenant of good faith and fair dealing does not create an independent source of duties for the parties to a contract. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir.1992). Rather, it simply guides the construction of explicit terms in the agreement. *Id.* Norandal does not argue that the covenant of good faith and fair dealing informs the interpretation of a particular contract term.

In any event, as discussed in Section I.B.1, Jackson had no duty to notify Norandal of the Scottsboro defaults and therefore did not violate the implied covenant of good faith and fair dealing. The definition of "Senior Default Notice" has no bearing on the parties' obligations under the Subordination Agreement and confers no substantive rights. "Parties to a contract . . . are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract." *VIII South Michigan Assocs.*, 276 Ill. App. 3d at 367, 657 N.E.2d at 1104. Jackson acted in accordance with the negotiated terms of the Subordination Agreement, and did not breach the implied covenant of good faith and fair

36

dealing.

## 2. The Doctrine Of Unclean Hands

Unclean hands is an "exceptional" defense that "rarely prevents the grant of the relief that would otherwise be appropriate." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 193 (7th Cir. 1985). Unclean hands will bar a plaintiff's recovery in a court of equity if the plaintiff's misconduct, fraud, or bad faith (1) was in connection with the very transaction being considered or complained of; and (2) was directed toward the defendant. *Cunningham v. Equicredit Corp. of Illinois*, 256 F. Supp. 2d 785, 797-98 (N.D. Ill. 2003).

Norandal argues that "[b]ecause [Jackson and the PPM Entities] violated their duty of good faith and fair dealing, the PPM Entities have unclean hands." (R. 63-1, Norandal's Opp. Mem. at 29.) Specifically, Norandal argues that "[b]y concealing Scottsboro's true financial status from Norandal, the PPM Entities prevented Norandal from adequately protecting itself." (*Id.* at 30.) First, Jackson did not violate the implied covenant of good faith and fair dealing, as discussed above. Second, Jackson's failure to notify Norandal of Scottsboro's default cannot give rise to a claim of unclean hands because Jackson had no duty to do so. Norandal cannot establish that Jackson engaged in misconduct, fraud, or bad faith because Jackson acted in accordance with the unambiguous terms of the Subordination Agreement.

Norandal's affirmative defense that Jackson has unclean hands has no merit.

## I. The Doctrine of "Equity Abhors A Forfeiture" Does Not Bar Jackson's Claims

Norandal asserts that Jackson's claims are barred by the doctrine that "equity abhors a forfeiture." Forfeiture is the failure to timely assert a right. *United States v. Wood*, 301 F.3d 556,

560 (7th Cir. 2002). Forfeiture occurs by accident, neglect, or the inadvertent failure to timely

assert a right. *Id.* "A court of equity abhors forfeitures, and will not lend its aid to enforce them.

Nor will it give its aid in the assertion of a mere legal right contrary to the clear equity and justice

of the case." *Beverage Realty, Inc. v. Chatham Club, LLC,* No. 01 C 1396, 2003 WL 444572, at

*4 (N.D. Ill. Feb. 21, 2003). However, a court will give effect to a forfeiture that has been

declared in the manner prescribed in a contract between the parties. *Tadros v. Kuzmak,* 277 Ill.

App. 3d 301, 306, 660 N.E.2d 162, 166 (Ill. App. Ct. 1995).

It is unclear what right Norandal seeks to protect from forfeiture. Norandal states without

support or explanation that "[i]n their First Amended Complaint, PPM Finance is seeking the

forfeiture of Norandal's proceeds from the sale of its collateral because of Scottsboro's alleged

breaches," and then cryptically asserts that "[t]he doctrine of 'equity abhors a forfeiture' applies

in a situation, such as this, where a contract may give a party a right to take a certain action, but

the facts surrounding the event indicate that it would be inequitable to allow that party to take

that action." (R. 63-1, Norandal's Opp. Mem. at 33.) Norandal has a senior security interest in

Scottsboro's spare parts inventory, but Norandal fails to establish how giving effect to the

negotiated terms of the Subordination Agreement would cause Norandal to forfeit "proceeds

from the sale of its collateral."

Norandal further states that "in the absence of a material breach by Scottsboro, PPM

Finance has no right to its own nonperformance under the Credit Agreement or to require

Norandal's forfeiture of its rights under the Subordination Agreement." (R. 63-1, Norandal's

Opp. Mem. at 34.) As Jackson points out, this argument is "unintelligible." It is unclear what

alleged duty Jackson is seeking to shirk through "nonperformance." Jackson does not owe an

38

affirmative duty to Norandal under the Subordination Agreement.

Norandal will not forfeit any right by remitting the payments to Jackson according to the negotiated terms of the Subordination Agreement.

**J.      PPM Fund and PPM CBO II Are Not Necessary Parties**

Norandal argues that the PPM Entities (PPM Fund and PPM CBO II) are "necessary parties" under Federal Rule of Civil Procedure 19(a) because they signed the Subordination Agreement as "Purchasers."

Rule 19 requires that the PPM Entities be joined if (1) "complete relief cannot be accorded" Jackson and Norandal without the PPM Entities; or (2) the PPM Entities "claim an interest relating to the subject of the action and is so situated that the disposition of the action in [the PPM Entities'] absence may (i) as a practical matter impair or impede [the PPM Entities'] ability to protect that interest or (ii) leave [Jackson or Norandal] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations . . . ." Fed. R. Civ. P. 19(a).

The PPM Entities are not necessary parties because complete relief will be accorded Jackson and Norandal in the absence of the PPM Entities. Although the PPM Entities are Senior Creditors under the Subordination Agreement, Jackson must be paid in full before the PPM Entities receive any payment on their debt. (R. 52-1, Jackson's Index of Exs., Ex. 6, Intercreditor Agreement § 2.1.) Since Jackson is owed approximately $11.5 million, payment by Norandal of the entire amount demanded by Jackson in this litigation still leaves Jackson significantly unpaid. (R. 49-2, Jackson's Rule 56.1(a)(3) Statement ¶ 101; R. 62-1, Norandal's Rule 56.1(b)(3)(A) Response ¶ 101.) Similarly, there is no risk that the PPM Entities' absence would impair or impeded their ability to protect their own interests because their interests are subordinated to

39

Jackson's according to the Intercreditor Agreement. The PPM Entities are therefore not necessary parties.

### K.  Norandal's Rule 12(b)(6) Motion Is Not Properly Before The Court

Norandal asserts as its First Affirmative Defense that Jackson failed to state a claim upon which relief could be granted. This is tantamount to a Rule 12(b)(6) motion, which must be made before the party answers the complaint. *See* Fed. R. Civ. P. 12(b)(6). This affirmative defense is not properly before the Court, and the Court need not consider it.

## II.  Norandal's Counterclaims Fail As A Matter Of Law

### A.  Count I: Norandal Is Not Entitled To A Declaratory Judgment

In Count I of its Counterclaim, Norandal seeks a declaratory judgment. The Court has already considered and rejected the basis for each statement that Norandal asks the Court to declare.

Specifically, Norandal seeks an Order declaring: (1) that the PPM Entities permitted Scottsboro to make payments to Norandal pursuant to the Promissory Note until July 27, 2001[15]; (2) that PPM Finance did not provide Norandal with Notice of any Senior Default until July 27, 2001[16]; (3) that Norandal is a holder in due course for all payments it received from Scottsboro Properties pursuant to the Promissory Note prior to July 27, 2001[17]; (4) that the PPM Entities are precluded from recovering from Norandal payments that Scottsboro Properties made to Norandal

---

[15] The Court addressed and rejected this assertion in Section I.A.

[16] This is an undisputed, immaterial fact.

[17] The Court addressed and rejected this assertion in Section II.C.

pursuant to the Promissory Note under the Voluntary Payment doctrine[18]; (5) that there was no

Senior Default in existence and continuing at the time that Scottsboro Properties made payments

to Norandal under the Promissory Note[19]; (6) that all of the payments that Scottsboro Properties

made to Norandal pursuant to the Promissory Note were payments properly made to Norandal

under Section 2.3 of the Subordination Agreement[20]; (7) that none of the payments that

Scottsboro Properties made to Norandal pursuant to the Promissory Note were "incorrect

Payments" under Section 2.5 of the Subordination Agreement[21]; and (8) that Norandal is not

liable to any of the PPM Entities for any payments it received from Scottsboro Properties

pursuant to the Promissory Note prior to July 27, 2001.[22] (R. 35-1, Norandal's First Am.

Countercl. at 12-13.) Accordingly, summary judgment is granted against Norandal as to Count I.

### B.    Count II:  Equitable Estoppel Does Not Bar Jackson's Claims

The Court addressed and rejected this argument in Section II.E.  Accordingly, summary

judgment is granted against Norandal as to Count II.

### C.    Count III:  Norandal Has No Claim Of Recoupment

Recoupment is a mitigation of damages. *In re A and C Elec. Co.*, 211 B.R. 268, 273

(Bankr. N.D. Ill. 1997).  It is an equitable right based on the premise that "where the creditor's

claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a

---

[18] The Court addressed and rejected this assertion in Section II.F.

[19] The Court addressed and rejected this assertion in Section I.C.

[20] The Court addressed and rejected this assertion in Section I.

[21] The Court addressed and rejected this assertion in Section I.A.

[22] The Court has determined that Norandal is required to remit those payments to Jackson.

41

defense to the debtor's claim against the creditor rather than a mutual obligation . . . ." *Lee v. Schweiker*, 739 F.2d 870, 875 (3ᵈ Cir.1984). Under the doctrine of recoupment, no affirmative recovery may be permitted. *In re Rooster, Inc.*, 127 B.R. 560, 569 (Bankr.E.D.Pa.1991).

Norandal's recoupment counterclaim, like its affirmative defenses of unclean hands and estoppel, is "based on the grounds that [Jackson] acted wrongfully in failing to provide Norandal with notice of a Senior Default prior to July 27, 2001." (R. 63-1, Norandal's Opp. Mem. at 24-25.) But, as discussed above, Jackson had no duty to notify Norandal of any Senior Defaults.

Norandal asserts, without articulating the basis of its recoupment claim, that "Norandal's recoupment claim . . . is applicable in light of the PPM Entities' breach of the implied covenant of good faith and fair dealing." (R. 63-1, Norandal's Opp. Mem. at 31.) As discussed in Section II.H, however, Jackson did not breach the implied covenant of good faith and fair dealing.

Accordingly, summary judgment is granted against Norandal as to Count III.

## CONCLUSION

Norandal breached the terms of the Subordination Agreement by failing to hold in trust payments it received from Scottsboro that were not permitted under the Subordination Agreement. None of the affirmative defenses that Norandal raises has merit. Accordingly, Jackson's motion for summary judgment on its amended complaint is granted as to both counts, and its motion for summary judgment against Norandal on Norandal's affirmative defenses is granted.

Norandal is not entitled to the declaratory relief that it seeks, equitable estoppel does not bar Jackson's claims, and Norandal's claim for recoupment fails. Accordingly, Jackson's motion for summary judgment against Norandal as to all counts of Norandal's counterclaim is granted,

and Norandal's motion for summary judgment as to all counts of its counterclaim is denied.

Judgment is entered for Jackson in the amount of the sum total of the fifteen payments at issue. In addition, Jackson is entitled to prejudgment interest on that amount under the Illinois Interest Act, 815 Ill. Comp. Stat. 205/2, at the rate of five (5) percent per annum.[23]

Dated: January 20, 2004

ENTERED

_____
AMY J. ST. EVE
United States District Court Judge

---

[23] In an action to recover interest on a written instrument under 815 Ill. Comp. Stat. 205/2, the creditor need not prove that payment was delayed unreasonably and vexatiously in order to be awarded prejudgment interest. *3D Exs., Inc. v. Merchantwired, LLC*, No. 02-C 832, 2002 WL 31399416, at *2 (N.D. Ill. Oct. 23, 2002); *Kubinski & Sons v. Dockside Dev. Corp.*, 33 Ill. App. 3d 1015, 1023, 339 N.E.2d 529, 536 (Ill. App. Ct. 1975). Because the Subordination Agreement is a "written instrument" and the amount due is undisputed, Jackson is entitled to prejudgment interest.